# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

SCOTTIE LAMAR JENNINGS,   )
           )
   Plaintiff,     )
           )
v.           )  Case No. 2:22-cv-00393-MHH-NAD
           )
MATTHEW VOSS, et al.,   )
           )
   Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

This opinion concerns Scottie Lamar Jennings's Fourth Amendment excessive force claims against Tarrant Police Sgt. Matthew Voss and Tarrant Police Officers Jonathan Page and Michael Morris.[1] The magistrate judge entered a report in which he recommended that the Court grant the police officers' motion for summary judgment. (Doc. 61). Mr. Jennings has objected to the report and recommendation. (Doc. 62). In his objections, Mr. Jennings mainly discusses the unavailability of body camera footage to document his version of events. (Doc. 62, pp. 2-3). Mr. Jennings asserts that his version of the events that occurred on May 3,

---

[1] The Court previously dismissed Mr. Jennings's other claims based on the magistrate judge's § 1915 screening of Mr. Jennings's complaint. (Docs. 19, 23). Mr. Jennings asserts his excessive force claim against the defendant police officers in their individual capacities.

2020 is correct and that his excessive force claims against Sgt. Voss and Officers Page and Morris should proceed.  (Doc. 62, pp. 1, 3).[2]

*** 

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  A district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objective to.").  A district court's obligation to "'make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made,'" 447 U.S. at 673 (quoting 28 U.S.C. § 636(b)(1)), requires a district judge to "'give *fresh consideration* to those issues to which specific objection has been made by a party,'" 447 U.S. at 675 (quoting House Report No. 94-1609, p. 3 (1976)).  *United States v. Raddatz*, 447 U.S. 667 (1980) (emphasis in *Raddatz*).

---

[2]  In his objections, Mr. Jennings also discusses whether he should have had to register as a sex offender under ASORCNA, argues that he did not know that he had to sign all written submissions under penalty of perjury, asserts that none of the defendants remains employed by the City of Tarrant Police Department, and contends that the officers did not have a warrant for his arrest on May 3, 2020.  (Doc. 62, pp. 1-3).

Generally, in reviewing the magistrate judge's report, Mr. Jennings's objections, and the evidence in the summary judgment record, the Court must view the evidence in the light most favorable to Mr. Jennings. *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016).[3] The Supreme Court identified an exception to this general rule in *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Supreme Court held: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. The Eleventh Circuit has identified two categories of evidence that a district judge may credit when the evidence blatantly contradicts the non-movant's version of events: video evidence and medical evidence. *See Cunningham v. Cobb Cnty., Ga*, 141 F.4th 1201, 1211-12 & n. 3 (11th Cir. 2025) ("When video evidence is available, we must "view[ ] the facts in the

---

[3] In *Perez*, the Eleventh Circuit explained that "what are considered the 'facts'" in a summary judgment opinion "may not turn out to be the 'actual' facts if the case goes to trial; rather, they are the 'facts' at this stage of the proceedings." *Perez*, 809 F.3d at 1217 (citing *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013)). The Eleventh Circuit noted that when there are several witnesses to an event, there may be "numerous, varying accounts of what happened." *Perez*, 809 F.3d at 1217. A district court must sort through the varying accounts and provide a factual account in a summary judgment opinion that portrays the evidence in the light most favorable to the non-movant. When presenting the facts in the light most favorable to the non-movant, a district court may not include speculation. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact.") (italics in *Cordoba*). In an excessive force case like this, viewing the evidence in the light most favorable to the plaintiff, a district court must "then answer the legal question of whether the defendants are entitled to qualified immunity under that version of the facts." *Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (same).

light depicted by the videotape," so long as "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.") (quoting *Scott*, 550 U.S. at 378, 381); *Whitehead v. Burnside*, 403 Fed. Appx. 401, 403 (11th Cir. 2010) ("Although [the plaintiff] attempts to overcome summary judgment by offering his own sworn statements . . . to support his allegations, the contemporaneous medical records and opinions of the examining medical doctors show that this purported evidence is baseless.").[4]

---

[4] *See also Baker v. City of Madison, Ala.,* 67 F.4th 1268, 1277-78 (11th Cir. 2023) (video); *Baxter v. Roberts*, 54 F.4th 1241, 1253, 1257-59 (11th Cir. 2022) (video); *Shaw v. City of Selma*, 625 F.3d 1093, 1098 (11th Cir. 2018) (video); *Sumlin v. Lampley-Copeland*, 757 Fed. Appx. 862, 867 (11th Cir. 2018) (medical evidence).

The following discussion in the *Baxter* decision illustrates how a district court should apply the exception to the general rule:

> Seeking to raise a genuine dispute of material fact about whether he was in fact driving carelessly when Deputy Lee pulled him over, Baxter points to two pieces of record evidence—(1) his deposition testimony and (2) a declaration he submitted with his summary judgment response—in which he provided descriptions of his driving that differ from Deputy Lee's account in the incident report. At his deposition, Baxter testified that, in the moments before Deputy Lee pulled him over, he "wasn't swerving and crossing lines," but had simply passed a slower-moving car while Deputy Lee was following him. In his declaration, Baxter similarly testified that Deputy Lee pulled him over after he "signaled and changed lanes to pass a vehicle traveling well below the speed limit" and then "signaled again and returned to [his] correct lane."

> The testimony Baxter cites directly conflicts with Deputy Lee's description of his driving. Were this all the evidence we had to go on in the record—*i.e.*, the incident report on the one hand and the deposition and declaration testimony on the other— we might very well have a genuine dispute of material fact about whether Baxter was driving carelessly. In that situation, the record would present a swearing match that could not be resolved at summary judgment. *See, e.g.*, *Stryker [v. City of Homewood]*, 978 F.3d [769,] 775 n.2, 776–77 [11th Cir. 2020] (reversing grant of

summary judgment where parties testified to "competing versions" of defendant officer's use of force during arrest and there was no video recording of the incident).

In this case, however, we also have the footage from Deputy Lee's bodycam, which at summary judgment we preference to the extent it squarely conflicts with Baxter's testimonial descriptions. *See Scott*, 550 U.S. at 380 (noting that "a court should not adopt" a party's description of the facts at summary judgment if it "is blatantly contracted" by objective evidence in the record, such as a video recording). On the video, we observe Deputy Lee approach the passenger side of Baxter's truck and tell Baxter that he was "just all over the road." Without hesitation, Baxter responds: "I was trying to make a phone call." A few seconds later, Deputy Lee goes on to describe the length of time he had observed Baxter driving erratically—"from Highway 90 at 71 North near CVS all the way to here"—to which Baxter's response is simply "Okay." The meaning of this dialogue is plain: confronted with a description of his careless driving, Baxter accepted that description and offered an excuse. Ultimately, because Baxter's statement that he had been "trying to make a phone call" contradicts his later deposition testimony that he "wasn't swerving and crossing lines" and had only cautiously passed a slower-moving car, we view the facts in the light depicted by the bodycam video. *See Shaw*, 884 F.3d at 1098.

Baxter counters that his "phone call" statement to Deputy Lee is not actually in conflict with his later testimony that he was driving safely. But he offers no colorable explanation as to how his "trying to make a phone call" remark could have been anything other than an acknowledgement of and justification for his distracted driving. At summary judgment, to be sure, we draw "all reasonable factual inferences" in the nonmovant's favor. *Stryker*, 978 F.3d at 773. But "[e]ven in the summary judgment context, we are not required to accept *any* interpretation of testimony by the non-movant." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1278 n.6 (11th Cir. 2002) (emphasis added). A nonmovant who wants us to interpret the record in a way that would preclude summary judgment must explain how such an interpretation is reasonable. Baxter has not done so.

Putting Baxter's "after the fact" testimony to one side, the remaining relevant evidence in the record—*i.e.*, Deputy Lee's incident report and the bodycam video—points to only one reasonable conclusion: Baxter was on his cell phone, distracted at the wheel, and driving erratically when Deputy Lee pulled him over on December 24, 2017. Baxter's careless driving provided Deputy Lee with the necessary reasonable suspicion to justify the stop. Accordingly, there is no genuine dispute of material fact as to whether Deputy Lee violated Baxter's Fourth Amendment rights in initiating the stop. He clearly did not. We affirm the district court's grant of summary judgment on this issue.

*Baxter*, 54 F.4th at 1257-59 (alterations in brackets in *Baxter*).

As the magistrate judge noted, in considering the evidence in the summary judgment record, the Court may not consider facts that appear only in unsworn statements. *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022). In *Roy*, the Eleventh Circuit explained:

> At the summary judgment stage, parties may submit traditional affidavits sworn under oath before a notary (or another oath-taker) affixed with the notary seal. Affidavits must: (1) be made on personal knowledge, (2) set forth facts that would be admissible in evidence, and (3) show that the affiant is competent to testify on the relevant matter. Fed. R. Civ. P. 56(c)(4). Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment. *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003). An unsworn statement is incompetent to raise a fact issue precluding summary judgment. *See id.*; *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315–16 (3d Cir. 2019) (concluding that an unsworn statement that was not given under the penalty of perjury was "incompetent summary judgment evidence").
>
> A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for a sworn affidavit or sworn declaration for purposes of summary judgment if certain statutory requirements are met. *See* 28 U.S.C. § 1746; *see also* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."). Specifically, under § 1746, a declaration executed within the United States will substitute for a sworn affidavit if the declarant dates and subscribes the document as true under penalty of perjury in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746(2).
>
> In short, § 1746 has these statutory requirements for an unsworn statement to substitute for a sworn affidavit: The declarant must (1) date and sign the document, and (2) subscribe its content as "true," (3)

under "penalty of perjury," (4) in substantially the above-quoted pattern language. *Id.*

*Roy*, 53 F.4th at 1347-48.  Under these criteria, the Court may consider facts that appear in Mr. Jennings's sworn complaint, (Doc. 1), in his declaration made pursuant to 28 U.S.C. § 1746, (Doc. 53), and in his response to the defendants' declarations because Mr. Jennings stated at the end of that document that he "ha[d] not committed purgury [*sic*]; But spoke the truth . . . ."  (Doc. 49, p. 6).  Mr. Jennings also signed and dated Doc. 49.[5]

***

Applying these procedural standards to assess the summary judgment evidence, the Court adopts the magistrate judge's analysis with respect to Officer Morris.  Officer Morris is entitled to qualified immunity on Mr. Jennings's excessive force claim because Mr. Jennings has not alleged facts that indicate that Officer Morris used force against him.  (Doc. 61, pp. 23-24).  In his complaint, Mr. Jennings alleges that Sgt. Voss beat and maced him and that Officer Page tazed him.  (Doc. 1, p. 11).  Mr. Jennings does not allege that Officer Morris was present at the scene of his arrest.  (Doc. 1).  In his declaration, Mr. Jennings similarly describes force that Sgt. Voss and Officer Page used, but Mr. Jennings does not implicate Officer

---

[5] The magistrate judge treated Mr. Jennings's unsworn submissions as arguments regarding the summary judgment evidence.  (Doc. 61, pp. 9-10).  The Court will do the same.

Morris in the use of force.  (Doc. 53, p. 7).  Therefore, the Court overrules Mr. Jennings's objections to the extent that they pertain to Officer Morris.

***

With respect to Mr. Jennings's excessive force claims against Sgt. Voss and Officer Page, the Court notes that much of the force that Mr. Jennings describes is undisputed, and the magistrate judge properly explained the law concerning the objective reasonable officer standard and the factors a district court must consider in applying the standard.  (Doc. 61, pp. 12-16).  The Court briefly expands on the magistrate judge's discussion of the law to incorporate two recent decisions from the Eleventh Circuit Court of Appeals:  *Jones v. Ceinski*, 136 F.4th 1057 (11th Cir. 2025), and *Cunningham v. Cobb Cnty., Ga*, 141 F.4th 1201 (11th Cir. 2025).

In *Jones*, the plaintiff alleged that the defendant law enforcement officer used excessive force during a traffic stop.  Because Mr. Jones appealed from a summary judgment order in favor of the officer, to determine whether the officer was entitled to qualified immunity, the Eleventh Circuit presented the disputed facts concerning the traffic stop in the light most favorable to Mr. Jones.  Viewed in that light, the evidence showed that the officer stopped Mr. Jones for a minor traffic violation; Mr. Jones immediately pulled over when the officer started his emergency lights; Mr. Jones waited in his car, provided the papers the officer requested, and volunteered his concealed carry permit for the gun he had in his car.  Mr. Jones exited his car

8

somewhat slowly because he has a severe hand deformity that made it difficult for him to open the car door.  When Mr. Jones refused to tell the officer where his gun was located in the car, the officer began swearing at Mr. Jones, using racial epithets. 136 F.4th at 1060-61.  When Mr. Jones emerged from the car, the officer "grabbed his wrist, twisted his arm, pushed him against the car, placed him in a chokehold, and punched him on the top of the head."  136 F.4th at 1061.

Because Mr. Jones did not dispute that the officer was acting within his discretionary authority during the traffic stop, to avoid summary judgment, Mr. Jones had to "'establish that a reasonable jury could find that [the officer] violated [his] constitutional right'" and that "'his right was clearly established when [the officer] violated it.'"  136 F.4th at 1061-62 (quoting *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024)).  With respect to the amount of force the officer used, the Eleventh Circuit explained:

> A claim of excessive force arising from "an arrest, investigatory stop, or other seizure of a free citizen" is reviewed under a standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 395, 399, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989) (internal quotation marks omitted).  "[T]o determine whether the use of force is objectively reasonable, we carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake under the facts of the particular case." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (citation and internal quotation marks omitted).  This fact-intensive inquiry requires us to weigh "the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade

arrest by flight." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (citation and internal quotation marks omitted).    We also consider "the relationship between the need and amount of force used and the extent of the injury inflicted." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (internal quotation marks omitted).    But we do not "mechanically apply . . . these factors." *Salvato*, 790 F.3d at 1293 (alterations adopted) (citation and internal quotation marks omitted).    "In the end[,] we must still slosh our way through the factbound morass of 'reasonableness.'" *Id.* (alteration adopted) (quoting *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)).

. . .

We may consider an officer's language when evaluating the totality of the circumstances, but "words alone [cannot] make . . . an otherwise proper[ ]" use of force "unconstitutional under the Fourth Amendment." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005).    Because *Graham v. Connor* instructs that an officer's intentions do not affect the objective reasonableness of force, [an officer's] alleged use of racial epithets throughout the encounter is not dispositive.    490 U.S. at 397, 109 S. Ct. 1865.    The question remains whether [the officer's] use of force was reasonably proportionate to the need for it.    *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

*Jones*, 136 F.4th at 1062 (some alterations in brackets in *Jones* and some added).

Applying these standards to Mr. Jones's version of events, the Eleventh Circuit found that the offense at issue was a "noncriminal traffic violation" that carried a $30 penalty.    The minor offense strongly weighed in favor of Mr. Jones. 136 F.4th at 1062-63.    So did Mr. Jones's compliance with the officer's instructions. "In the light of Jones's minor traffic infraction and his compliance throughout the stop, the reasonableness of [the officer's] force depend[ed] on the threat posed by Jones's access to his firearm."    136 F.4th at 1063.

The Eleventh Circuit held that the firearm in Mr. Jones's car would allow a reasonable officer to use some force to control Mr. Jones's access to the weapon, but the amount of force used had to be commensurate to the threat the firearm posed. The Eleventh Circuit explained:

> when an officer confronts an armed suspect "in a tense and dangerous situation," the law does not require the officer to "hope for the best" and "wait until the moment a suspect uses a deadly weapon to act to stop the suspect." In that circumstance, an "officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'"

*Jones*, 136 F.4th at 1063 (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration adopted) (citations and internal quotation marks omitted)). Mr. Jones's demonstrated willingness to comply with the officer's instructions did not preclude the officer from using force to ensure that Mr. Jones could not access the firearm. The Eleventh Circuit stated:

> the threat of harm to an officer from an individual—even a compliant one—who has access to a firearm during a late-night traffic stop is not negligible. And we must evaluate the situation "through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision . . . in circumstances where inaction could prove fatal."

136 F.4th at 1064 (quoting *Crosby v. Monroe County*, 394 F.3d 1328, 1334 (11th Cir. 2004)). The Eleventh Circuit held that the initial force the officer used to restrain Mr. Jones, the "wrist grab, arm twist, and push maneuvers[,] were reasonable uses of force to restrain him." 136 F.4th at 1064. The Eleventh Circuit

reversed the district court's summary judgment order on Mr. Jones's excessive force claim because "[t]aking Jones's version of events as true, he was subdued and in [the officer's] control after the wrist grab, twist, and push" such that "the additional chokehold and punch were gratuitous and excessive uses of force."  136 F.4th at 1065.  The officer could continue to use force "*only* until Jones was 'fully secured.'" 136 F.4th at 1065 (italics in *Jones*).  After that, even a single punch might be excessive if the punch were delivered to an individual "who no longer 'pose[d] a danger' to anyone." *Jones*, 136 F.4th at 1065 (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008)).

The Eleventh Circuit accepted Mr. Jones's argument that a broad, controlling principle clearly established his right to be free from excessive force under the circumstances of his arrest.  136 F.4th at 1065-66.  The Eleventh Circuit stated that the officer "had fair warning that his use of a chokehold and punch on Jones after he was subdued, compliant, and could not access his firearm violated Jones's right to be free from excessive force."  136 F.4th at 1066.    The Eleventh Circuit added: "We have long held that 'a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.'"  136 F.4th at 1066 (quoting *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017)). Therefore, the officer was not immune from suit for force Mr. Jones reported the

officer used after Mr. Jones was under control and could not access his firearm. 136 F.4th at 1066 (citing *Nelson*, 89 F.4th at 1300).

*Cunningham* represents the end of the spectrum opposite *Jones*. In *Cunningham*, the plaintiff alleged that the defendant law enforcement officers used excessive force during an arrest. Because there was body camera evidence in *Cunningham*, and neither party contested the authenticity of the footage, the Eleventh Circuit reviewed the video evidence *de novo* "along with all other record evidence, assessing the facts as they [we]re depicted in the footage." *Cunningham*, 141 F.4th at 1207, 1210 n. 3. The Eleventh Circuit reiterated: "While 'we must view the facts in favor of the nonmoving party, we accept video evidence over the nonmoving party's account when the former obviously contradicts the latter.'" *Cunningham*, 141 F.4th at 1211 (quoting *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022)).

Viewed in that light, the body camera evidence and other evidence showed that police arrived at a car dealership shortly after Mr. Cunningham burglarized it, saw Mr. Cunningham walking across the street from the dealership, and told Mr. Cunningham to stop. *Cunningham*, 141 F.4th at 1205. Mr. Cunningham ran from the officers, initially entering a "dark ditch of dense vegetation" and then emerging, only to be caught by one of the officers who fell on top of Mr. Cunningham after grabbing him from behind. *Cunningham*, 141 F.4th at 1205. The three officers at

the scene were unable to handcuff Mr. Cunningham because his hands were under his body, so they used "empty-hand closed-fist strikes" to Mr. Cunningham's head and side to compel Mr. Cunningham to show his hands. *Cunningham*, 141 F.4th at 1206. Eventually, one officer used his elbow to strike Mr. Cunningham in the upper back, and the officers were able to handcuff Mr. Cunningham. *Cunningham*, 141 F.4th at 1206. "At no point after handcuffing Cunningham did the Officers hit him." *Cunningham*, 141 F.4th at 1206.

Citing *Perez*, the Eleventh Circuit held that the officers who arrested Mr. Cunningham "were unquestionably operating within their discretionary authority." *Cunningham*, 141 F.4th at 1209. Therefore, the Court of Appeals moved to the next step in the qualified immunity analysis, namely whether the officers violated Mr. Cunningham's Fourth Amendment right to be free from excessive force. 141 F.4th at 1409 (quoting *Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1272 (11th Cir. 2021)). With respect to the amount of force the officers used, the Eleventh Circuit explained:

> "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest." *Johnson* [*v. City of Miami Beach*], 18 F.4th [1267,] 1272 [(11th Cir. 2021)]. "In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard." *Id.* Under that standard, "[a]n arresting officer's use of force is excessive if a reasonable officer would believe it is unnecessary in relation to the situation at hand." *Helm*, 989 F.3d at 1273. "Because determining reasonableness is an objective test, we do not consider an officer's intent or motivation." *Id.* Instead, we judge the reasonableness of an officer's use of force "*from the perspective of a*

*reasonable officer* on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis added). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

"Whether an officer has used excessive force depends on the facts and circumstances of each particular case, including a non-exhaustive list of factors, such as (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Johnson*, 18 F.4th at 1272 (cleaned up). "We also consider [(4)] the justification for the application of force, [(5)] the relationship between the justification and the amount of force used, and [(6)] the extent of any injury inflicted." *Richmond v. Badia*, 47 F.4th 1172, 1182 (11th Cir. 2022). "Not every push or shove violates the Fourth Amendment." *Johnson*, 18 F.4th at 1272 (internal quotations omitted). But "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

*Cunningham*, 141 F.4th at 1209 (some alterations in brackets in *Cunningham* and some added; italics in *Cunningham*).

Applying these standards, the Eleventh Circuit found that "[t]he record evidence here, and particularly, the Defendant Officers' body-camera footage, shows that five of the six factors we consider 'from the *perspective of a reasonable officer* on the scene—severity of the crime, whether the suspect poses an immediate threat to safety, whether he is actively resisting or attempting to evade arrest, the need for the application of force, and the relationship between the need and amount of force used—weigh against' Cunningham." *Cunningham*, 141 F.4th

at 1210 (quoting *Mobley v. Palm Beach Cnty Sheriff Dept.*, 783 F.3d 1347, 1355

(11th Cir. 2015)) (emphasis added).  The Eleventh Circuit explained:

> The Defendant Officers reasonably believed that
> Cunningham committed burglary, a serious crime.  Cunningham ran
> from the Defendant Officers into thick vegetation, when it was pitch
> black outside, evading arrest. The Defendant Officers had no
> opportunity to search Cunningham for weapons or handcuff him prior
> to physically engaging with him. When Officer McDonald brought
> Cunningham to the ground after chasing him, the Defendant Officers
> demanded repeatedly that Cunningham put his hands behind his back,
> but he did not comply.  Instead, he kept his hands underneath his body
> and said only that he did nothing wrong—not that his hands were stuck.
> Officer McDonald eventually fought to gain control of Cunningham's
> right arm, but Cunningham refused to surrender his left arm, keeping it
> underneath his body near his waistband.  Although force was used to
> stop Cunningham from fleeing and to gain control of his hands, none
> was applied once he was handcuffed.

*Cunningham*, 141 F.4th at 1210 (footnote omitted).

Mr. Cunningham argued that in finding that the officers were entitled to

qualified immunity, the district court erred because the court did not properly credit

his version of events or the opinion of his expert, and there was no evidence that he

was armed.  The evidence that Mr. Cunningham cited in support of his argument

"d[id] not change [the Eleventh Circuit's] conclusion."  *Cunningham*, 141 F.4th at

1211.  The Eleventh Circuit stated:

> As noted above, when determining whether an officer's use of force is
> reasonable, we must view the situation from their
> perspective. *Crenshaw* [*v. Lister*], 556 F.3d [1283,] 1290 [(11th Cir.
> 2009)] (explaining that the "reasonableness of a particular use of force
> must be judged from the perspective of a reasonable officer on the
> scene"); *see Ryburn v. Huff*, 565 U.S. 469, 477, 132 S.Ct. 987, 181

16

L.Ed.2d 966 (2012) (per curiam) (noting that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation"). That the Defendant Officers had not found a weapon before striking Cunningham does not mean that, from their perspective, they knew he did not have one on him. And simply because Cunningham now claims that he did not give the Officers his left hand because it was stuck does not mean that a reasonable officer at the scene would have viewed his resistance as such. And the body-camera footage shows that he never communicated why he could not comply with the Officers. Instead, the footage, with clear audio, shows that Cunningham resisted the Officers' commands and stated only, "I didn't do anything" and "what did I do." So even if Cunningham failed to comply because his arm was trapped, a reasonable officer in this situation could conclude that (1) Cunningham had a weapon on him and (2) his failure to surrender was an effort to conceal or gain control of that weapon. Because that conclusion was reasonable, the Defendant Officers' use of force in arresting Cunningham was not excessive, and the record evidence Cunningham points to does not create a dispute on that issue. *See Mobley*, 783 F.3d at 1356 ("[F]orce applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive.").

*Cunningham*, 141 F.4th at 1211. The Eleventh Circuit discounted Mr. Cunningham's expert's opinion because the officers' body-camera footage showed that Mr. Cunningham resisted arrest, the expert's opinion notwithstanding. *Cunningham*, 141 F.4th at 1211.

Because the evidence demonstrated that the force the officers used to arrest Mr. Cunningham was objectively reasonable, Mr. Cunningham did not establish that the officers violated his constitutional rights. Therefore, the officers were entitled

to qualified immunity on Mr. Cunningham's excessive force claim. *Cunningham*, 141 F.4th at 1212.

***

The record here contains very little video evidence. As Mr. Jennings emphasized in his objections, the analysis of the force used in his arrest would be easier if Sgt. Voss and Officer Page had been wearing body cameras and recorded their interactions with him. *See* pp. 3-5 above. But the police officers did not have body cameras on the night of May 3, 2020.[6] The limited video evidence in this case comes from a brief cell phone video and 45 seconds of surveillance camera recordings. (Doc. 64, p. 2). These recordings provide information about the conditions on the night of May 3, 2020 and the nature of the high-speed car chase

---

[6] In his objections, Mr. Jennings states that Sgt. Voss and Officer Page asserted in their declarations that they were not "wearing their body cam" during his arrest, but a "Department L[t]. said they weren't issued body cams or Dash cams." (Doc. 62, p. 2). Mr. Jennings asks: "Who is telling the truth, who is lying?" (Doc. 62, p. 2). Sgt. Voss and Officers Page and Morris stated in their declarations: "I was not equipped with a body-cam during this incident." (Doc. 40-1, pp. 21, 31, 37). Lt. Hill of the Tarrant Police Department stated in his supplemental declaration: "The incident which is the subject of this action occurred in May 2020. The TPD did not then use, issue to its officers (including the three officers who are defendants in this action) or possess any bodycams, dashcams, or other such video systems." (Doc. 57, p. 20). There is no substantive distinction between the defendants' statements and Lt. Hill's statement regarding bodycams. Lt. Hill's statement explains why Sgt. Voss and Officers Page and Morris were "not equipped with a body-cam during this incident." Mr. Jennings asks if the Court can subpoena the officers' dash and body cams, (Doc. 62, p. 3). He asserts that the officers conveniently did not have body cams on during "this" incident, meaning during his arrest. (Doc. 62, p. 3). Lt. Hill has explained that TPD did not possess video equipment in May 2020, so there is not dash cam or bodycam evidence for the Court to subpoena. Sgt. Voss and Officers Page and Morris did not wear cameras on May 3, 2020 because the TPD did not have body cameras at the time.

that led to the interaction between Mr. Jennings, Sgt. Voss, and Officer Page, but the circumstances surrounding Mr. Jennings's arrest are not captured by video evidence. The Court views the disputed evidence available through declarations and other documents in the light most favorable to Mr. Jennings.

Viewed in that light, the summary judgment evidence indicates that shortly after 8:40 p.m. on May 3, 2020, Sgt. Voss and Officers Page and Morris responded to a citizen's call regarding an individual passed out in bushes near a residence on 109 Murphree Road in Tarrant. (Doc. 40-1, pp. 17, 82; Doc. 53, p. 8). Meanwhile, Mr. Jennings left his mother's house at 3605 Murphree Road. (Doc. 53, p. 5; *see* Doc. 40-1, p. 81). At the time, Officer Voss was searching the area surrounding 109 Murphree Road in his patrol car. (Doc. 40-1, p. 18).[7]

Sometime between 8:40 and 8:50 p.m., after leaving 109 Murphree Road, Officers Morris and Page pulled Mr. Jennings over for a traffic stop. (Doc. 1, p. 5). Mr. Jennings was driving a white pickup truck, and the officers were in marked patrol cars. (Doc. 64). Mr. Jennings, who was a parolee at the time, came to a

---

[7] The Court obtained from Google Maps an image that depicts the relative location of 109 Murphree Road and 3605 Murphree Road. According to Google Maps, the houses at those addresses are .1 mile apart, and the driving time from one property to the other is 1 minute. The Court takes judicial notice of the distance between those properties on Google Maps. Fed. R. Evid. 201; *United States v. Proch*, 637 F.3d 1262, 1266 n. 1 (11th Cir. 2011) (taking judicial notice of addresses on a map under Fed. R. Evid. 201); *ServisFirst Bank v. Harding Enters., LLC*, No. 2:17-CV-00605-AKK, 2018 WL 3056687, at *1 (N.D. Ala. Mar. 26, 2018) (taking judicial notice of the distance between two addresses on Google Maps). The Court has attached to this opinion as Appendix A the Google Maps image of the relevant locations on Murphree Road.

complete stop, and Officers Morris and Page approached his truck. (Doc. 1, pp. 4-5; Doc. 49, p. 1; Doc. 53, p. 1).[8]  When Officers Morris and Page reached Mr. Jennings's truck, they began hitting the truck with their billy clubs. (Doc. 1, pp. 5, 11; Doc. 49, pp. 3-4; Doc. 53, pp. 5-6).  In fear, Mr. Jennings sped away, and the officers followed, chasing Mr. Jennings for several minutes. (Doc. 1, p. 11; Doc. 49, p. 4; Doc. 53, p. 6).[9]  Officer Page reported that during the chase, Mr. Jennings drove through residential neighborhoods and ran stop signs and traffic lights. (Doc. 40-1, p. 18; Doc. 40-2, pp. 45-47, 49-50).  Mr. Jennings does not dispute this description of the car chase.

Video evidence shows that at 9:00 p.m., just before the chase ended, Mr. Jennings drove past the Tarrant Public Safety Building that houses the Tarrant fire and police departments. (Doc. 64).[10]  Mr. Jennings's truck swerved, and his wheels

---

[8] When Officers Page and Morris pulled Mr. Jennings over on May 3, 2020, Mr. Jennings expected the officers to arrest him. (Doc. 53, p. 5).  Mr. Jennings explained that approximately two weeks earlier, Sgt. Voss and Officers Page and Morris had pulled him over for a traffic stop. (Doc. 1, pp. 11-12).  During the April 2020 traffic stop, the officers learned that Mr. Jennings had an outstanding arrest warrant for failure to register as a sex offender. (Doc. 1, pp. 11-12; *see also* Doc. 40-1, pp. 5, 24-25).  The officers tried to arrest him then, but the jurisdiction that issued the warrant directed the officers to release Mr. Jennings. (Doc. 53, p. 5).

[9] In his arrest report, Officer Page stated that Mr. Jennings came to a complete stop, that he and Officer Morris approached the truck, and that Mr. Jennings fled from them. (Doc. 40-1, p. 82).

[10] Doc. 64 contains a link to the surveillance recording from four cameras at the Tarrant Public Safety Building. (Doc. 64).  The surveillance video begins at 9:00 p.m. and depicts Mr. Jennings driving his truck and leading two police cars in a high-speed chase. (Doc. 64).  A police report from an investigating officer indicates that Mr. Jennings ran into the fence behind the Tarrant Public Safety Building at 9:00 p.m. (Doc. 40-2, p. 7).

screeched.  (Doc. 64).  The car chase ended when Mr. Jennings crashed his pickup truck into a fence in the rear parking lot of the Tarrant Public Safety Building.  (Doc. 40-1, pp. 45-67, 76, 82).  Mr. Jennings got out of his truck and ran 30 yards to the adjacent Burger King parking lot in search of a well-lit area where he could surrender to police.  (Doc. 1, p. 11; Doc. 53, p. 6; *see also* Doc. 40-1, p. 82).  Mr. Jennings laid face down on the ground beside the drive-thru window of the Burger King.  (Doc. 1, p. 11; Doc. 53, p. 6).

Officer Page and Sgt. Voss found Mr. Jennings there.  In his arrest report, Officer Page stated that Mr. Jennings's hands were underneath his body, and Mr. Jennings did not respond to commands to show his hands.  (Doc. 40-1, p. 82; *see also* Doc. 40-1, p. 28).  Mr. Jennings has not disputed that his arms were beneath him as he laid face down in the Burger King drive-thru lane.[11]

---

[11]  In one of the statements that he made under penalty of perjury, Mr. Jennings asserts that he did not curse, kick, or swing at the officers at any time during the "May 3, 2020 incident."  (Doc. 49, p. 3).  Mr. Jennings argues in his unsworn written submissions that he "did not resist, nor fight, while l[y]ing face down" and "was not resisting" the defendants.  (Doc. 50; p. 5; Doc. 51, p. 4).  In an unsworn response to Sgt. Voss's declaration, Mr. Jennings argued in what appears to be a hypothetical that if he was lying face down "with both hands visible," he could not put up a fight with two officers standing over him.  (Doc. 50, p. 4).  It is undisputed that at some point, Mr. Jennings hands were visible and available for the officers to place him in handcuffs.

In the offense report that he completed for the May 3 incident, Officer Page stated that Mr. Jennings was armed with knives.  (Doc. 40-1, p. 70) (block 150 on the incident report).  In the arrest report for the May 3 incident, Officer Page indicated that Mr. Jennings resisted arrest but that he was not armed with a firearm or another type of weapon.  (Doc. 40-1, p. 81) (block 41 on arrest report).  According to the incident report that Officer Page completed regarding the April 20 traffic stop, Mr. Jennings had a butcher knife in his truck during that stop.  (Doc. 40-1, p. 6).  Interestingly, Officer Page completed the incident report concerning the April 20 traffic stop on May 2, 2020.  (Doc. 40-1, p. 6).  In their summary judgment briefs, the officers do not contend

Mr. Jennings's telling of the events that followed varies in his complaint, his declaration, and his response to the officers' declarations. In his complaint, Mr. Jennings reports that as he lay face down on the ground, Seargent Voss "crashed down on [his] back screaming 'Sex Offender'" and used his fists to strike Mr. Jennings on the head. (Doc. 1, p. 11). Mr. Jennings states that "after several minutes" of beatings, his "head was jerked back," and he "was heavily maced in [his] face." (Doc. 1, p. 11). According to Mr. Jennings, the beatings to his head then resumed until Officer Page tased him in his groin three times. (Doc. 1, p. 11).

In his declaration, Mr. Jennings indicates that as he lay face down in front of the Burger King drive-thru window, Officer Page reached him first. Mr. Jennings asserts that when Sgt. Voss arrived, because he (Mr. Jennings) chose a well-lit area to surrender, Sgt. Voss "could see the [taser] barbs and crashe[d] down on [his] back (most likely how one of the barbs rolls to have entered [his] back 'backwards.'" (Doc. 53, p. 6).[12] "Then," Sgt. Voss began "screaming 'sex offender'" and "then

---

that Mr. Jennings was armed. Jurors could consider the conflicting evidence, doubt the veracity of the incident reports, and credit the arrest report for the May 3 incident that indicates that Mr. Jennings was not armed on May 3, 2020.

[12] In his declaration, Sgt. Voss stated that when he arrived at the Burger King parking lot, "Officer Page and [Mr.] Jennings were behind the bushes," and Sgt. Voss "saw taser barbs in [Mr.] Jennings' back indicating that [Officer] Page had used his taser in an attempt to secure [Mr.] Jennings." (Doc. 40-1, p. 19). As discussed below, Mr. Jennings's assertion in his declaration that there was a taser barb in his back when Sgt. Voss arrived seems to be an attempt on Mr. Jennings's part to accept the officers' version of events and explain why, under the officers' version of events, he contends that Officer Page tased him after Sgt. Voss maced him.

beg[an] striking the sides and back" of Mr. Jennings's head.  (Doc. 53, pp. 6-7).

"Thereafter, [Mr. Jennings's] head [was] pulled back and [Sgt.] Voss drown[ed]

[Mr. Jennings] continually with one spray of his O.C. spray."  Officer Page "then

tase[d] [Mr. Jennings] three individual times."  (Doc. 53, p. 7).  Mr. Jennings

concludes:  "This earnestly is a [Fourth] Amendment violation of excessive force;

After being beat by Defendant Voss; then drowned by his O.C. spray; to then be

tased by Defendant Page."  (Doc. 53, p. 7).

In response to the officers' summary judgment declarations and the evidence

attached to the officers' special report, Mr. Jennings states that he "didn't refuse"

Officer Page's orders to show his hands; he "just couldn't hear with" Sgt. Voss

"sitting on his back striking [him] in the sides of his head."  (Doc. 49, p. 4).  Mr.

Jennings disagreed with Officer Page's report that he tased Mr. Jennings "in the

<u>back</u>/<u>side</u> of his body."  (Doc. 49, p. 2) (underline in Doc. 49).  Mr. Jennings stated:

"Fact of the matter is; Plaintiff was immobilized three (3) times in his groin as

initially stated:  next to the drive-thru window."  (Doc. 49, p. 2).  Mr. Jennings asked

whether Officer Page's statement in his declaration that he first tased Mr. Jennings

"in the back/side area of his body," and "then placed the taser on [Mr.] Jennings'

buttocks and completed the single circuit tasing event," (Doc. 40-1, pp. 28-29),

counted as two tases, not one, and Mr. Jennings stated that Officer Page "move[d]

his taser location from Plaintiff[']s <u>back</u>/<u>side</u> to <u>buttocks</u>/<u>groin</u>, area."  (Doc. 49, p.

3) (underline in Doc. 49). Mr. Jennings stated that he "was maced first; then tased." (Doc 49, p. 4).[13]

Sgt. Voss and Officer Page filed use of force reports regarding the May 3 incident. In his report, Sgt. Voss stated that he sprayed Mr. Jennings once in the face with a chemical weapon, and the chemical weapon "immobilized" Mr. Jennings. (Doc. 40-1, p. 86).[14] In his report, Officer Page stated that he deployed his taser once, and the taser "immobilized" Mr. Jennings and left "puncture marks" from "taser barbs." (Doc. 40-2, p. 5).[15]

---

[13] Though the Clerk of Court docketed Docs. 49 and 53 on the same day, Mr. Jennings dated his signature on Doc. 53 as May 19, 2024, and he dated his signature on Doc. 49 as June 5, 2024. (Doc. 49, p. 7; Doc. 53, p. 8). Therefore, under the prison mailbox rule, the Court regards Doc. 53 as filed before Doc. 49. *Houston v. Lack*, 487 U.S. 266, 270-72 (1988) (finding that a prisoner's pleading is deemed filed at the time the prisoner delivers the pleading to prison or jail officials for mailing).

[14] The use of mace "in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the . . . danger to the officer[] and the risk of flight." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1244 (11th Cir. 2003). "[A]s a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (internal quotations and citations omitted). The Eleventh Circuit has stated that "pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee." *Vinyard*, 311 F.3d at 1348.

[15] As with the use of mace, "[t]he use of a taser is not categorically unconstitutional." *Charles v. Johnson*, 18 F. 4th 686, 701 (11th Cir. 2021). In *Charles*, the Eleventh Circuit reiterated that "the use of a taser can be appropriate in a wide array of situations. *See Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)." *Charles*, 18 F. 4th at 701. The question in each excessive force case is whether an officer's "use of a taser constituted excessive force under the totality of the circumstances." *Charles*, 18 F. 4th at 701.

On the use of force form that he completed, Officer Page had the option of indicating that the tase that he administered to Mr. Jennings had no effect, some or little effect, or immobilized Mr. Jennings. Officer Page checked immobilized. (Doc. 40-1, p. 76). In the incident report, Officer

On behalf of the officers, W. Blake Strickland, a "Master Taser Instructor" who has served as an "expert witness in multiple law enforcement liability cases involving use-of-force," (Doc. 45-1, p. 3), examined recorded data from Officer Page's taser and provided a log of the number of times Officer Page used his taser between October 2018 and July 2020. (Doc. 45-1, pp. 2-4). The log for the taser indicates that on May 3, 2020, Officer Page armed his taser at 9:15:33 p.m. and activated it for seven seconds at 9:15:36 p.m., armed the taser again at 9:15:47 p.m. and activated it for three seconds at 9:15:48, and armed the taser again at 9:15:56 p.m. but did not activate it a third time. (Doc. 45-3, pp. 3-4; *see* Doc. 45-1, pp. 4-5). Mr. Strickland stated that the log demonstrates that Officer Page's taser "had 2 related events where energy was discharged. The first event lasted 7 seconds. The second event lasted 3 seconds." (Doc. 45-1, p. 5). In his declaration, Mr. Strickland stated that the technique Officer Page used in closing the circuit allows an officer to "create the desired immediate incapacitation of the suspect." (Doc. 45-1, p. 6). Based on his review of the incident/offense report for Mr. Jennings's arrest, Mr. Strickland stated that "the drive-stun used by [Officer] Page successfully led the plaintiff to comply with his commands." (Doc. 45-1, p. 6).

---

Page stated that Mr. Jennings's arms came out from underneath him after the tase to his buttocks, but Mr. Jennings would not allow Officer Page to place him in handcuffs. (Doc. 40-1, p. 76). In his use of force report, Officer Page stated that a single tase immobilized Mr. Jennings. (Doc. 40-2, p. 5). Jurors will have to sort out this contradictory evidence.

The police and paramedic reports regarding the May 3 incident involving Mr. Jennings consistently refer to taser "barbs."  (Doc. 40-1, p. 83) (report stating that "the taser barbs were removed" from Mr. Jennings); (Doc. 40-2, pp. 9, 11) (paramedic report referring to taser "barbs").  The photo below depicts the projectile from a taser:



A

Source: Eric F. Reichman
Reichman's Emergency Medicine Procedures, Third Edition
Copyright © McGraw-Hill Education. All rights reserved.

(https://accessemergencymedicine.mhmedical.com/content.aspx?bookid=2498&sectionid=201295460).  There is one barb on each projectile.  The Court takes judicial notice of the photograph.  Viewed in the light most favorable to Mr. Jennings, Officer Page administered at least two taser barbs.[16]

Mr. Jennings has not offered expert evidence to challenge the taser log that Mr. Strickland generated on April 16, 2024.  The time stamps in the taser log and

---

[16] As discussed below in footnote 19, Sgt. Voss would not allow the paramedics to transport Mr. Jennings or to remove the taser barbs.  (Doc. 40-2, pp. 9-10, 14-15).

the time stamps in the May 4, 2020 report from the paramedics who saw Mr. Jennings on May 3 are inconsistent.  Paramedics responded on the evening of May 3 from the Tarrant Fire Department in the Tarrant Public Safety Building to the Tarrant City Jail in the same building to "check a tazer victim-pt. with barbs in left flank." (Doc. 40-2, pp. 9, 26-27).[17]  The report that the senior paramedic completed within 24 hours of the response, (Doc. 40-2, pp. 10, 26, 28), indicates that Tarrant Fire and Rescue received an alarm at 21:10:20 p.m.—9:10 p.m., (Doc. 40-2, p. 10), five minutes before Mr. Strickland's data indicates that Officer Page first activated his taser.[18]  The paramedics were dispatched at 21:11:40 and arrived two seconds later at 21:11:42—9:11 p.m.    (Doc. 40-2, p. 10; *see also* Doc. 40-2, p. 15 (handwritten report that Sgt. Voss and three paramedics appear to have signed at the scene)).  The chief paramedic indicated that Mr. Jennings's symptoms began at 9:10 p.m.  (Doc. 40-2, p. 12).  He reported that Mr. Jennings had been tased for one

---

[17] In his April 2024 declaration, the senior paramedic stated that he and two other paramedics were dispatched to the Tarrant City Jail at approximately 9:10 p.m. "to assess a prisoner who had been tased during his arrest a short while earlier." (Doc. 40-2, p. 26).  The paramedic stated that he and the other paramedics "walked down the hall of the [Tarrant] Public Safety Building and arrived at the Jail within a minute." (Doc. 40-2, p. 27).  In the report that the paramedic completed on May 4, 2020, the paramedic indicated that his team's "Response Mode" was "Lights and Sirens," suggesting that there was a vehicle involved. (Doc. 40-2, p. 10; *see also* Doc. 40-2, p. 15 (handwritten report that Sgt. Voss and three paramedics appear to have signed at the scene; report indicates that a vehicle was involved in the dispatch, and the paramedics were dispatched, arrived, and encountered Mr. Jennings at 9:11 p.m.)).    The different explanations of the paramedics' means of reaching Mr. Jennings is not relevant to the summary judgment analysis.

[18] (*See also* Doc. 40-2, p. 26) (declaration of senior paramedic in which he states that he and his team were dispatched to the Tarrant jail to see Mr. Jennings at 9:10 on May 3, 2020).

minute, and he indicated that he obtained Mr. Jennings's heart rate and ran an ECG at 9:14 p.m., one minute before the taser log indicates that Officer Page first activated his taser. (Doc. 40-2, pp. 12-13). The paramedic obtained Mr. Jennings's blood pressure with a manual blood pressure cuff at 9:14 p.m. (Doc. 40-2, p. 12; *see also* Doc. 40-2, p. 27). The paramedics spoke with Mr. Jennings and reported that he obeyed commands, interacted with them, and responded appropriately to commands. (Doc. 40-2, p. 12; *see also* Doc. 40-2, p. 27). The paramedics consistently reported that they observed taser "barbs" in the area of Mr. Jennings's lower back/"flank." (Doc. 40-2, pp. 9, 13, 14). The Court has found nothing in the record that explains how paramedics responded to and examined "a tazer victim" (who cooperated fully) before Officer Page reportedly deployed his taser.

Exploration of these inconsistent time records in discovery may reveal evidence that supports Mr. Jennings's report that Sgt. Voss maced him first, and then an officer tased him at least twice. The time gap between Mr. Jennings's wrecking of his truck shortly after 9:00 p.m. and the first arming of Officer Page's taser gun at 9:15:33 p.m. supports Mr. Jennings's contention that Sgt. Voss maced him, incapacitating him, (Doc. 40-1, p. 86), before Officer Page tased him at least twice. Jurors will have to decide whether to accept Sgt. Voss's statement in his declaration that when he arrived on the scene, Mr. Jennings already had "taser barbs in [his] back." (Doc. 40-1, p. 19). To accept Sgt. Voss's statement, jurors will have to find

that Sgt. Voss arrived after 9:15 p.m. (if jurors credit the taser log) and after the paramedics arrived and took Mr. Jennings's blood pressure and ran an EKG (if jurors credit the paramedic reports), and that Sgt. Voss then maced Mr. Jennings in the Tarrant Jail while Officer Page and paramedics stood by.

***

The evidence of Mr. Jennings's encounter with Sgt. Voss and Officer Page bears similarities to *Cunningham* and to *Jones*. Like Mr. Jones and Mr. Cunningham, Mr. Jennings does not dispute that the defendant law enforcement officers were acting within their discretionary authority when they arrested him. Accepting Mr. Jennings's version of events as true, on May 3, 2020, Officers Page and Morris pulled him over for a traffic stop, and Sgt. Voss joined Officers Page and Morris in pursuit of Mr. Jennings after Mr. Jennings fled from the traffic stop. (Doc. 1, pp. 5, 11). Precedent confirms that Officer Page was acting within his discretionary authority in conducting a traffic stop as were Sgt. Voss and Officer Page in pursuing a fleeing suspect. *Manners v. Cannella*, 891 F.3d 959, 967-68 (11th Cir. 2018) (finding that police officers were acting within their discretionary authority when they conducted a traffic stop and arrested a suspect).[19] Therefore, to

---

[19] As noted below, Mr. Jennings contends that Sgt. Voss and Officer Page caused his flight because when they approached his truck, they began hitting the truck with their billy clubs. (Doc. 1, pp. 5, 11; Doc. 49, pp. 3-4; Doc. 53, pp. 5-6). Mr. Jennings asserts that he sped away in fear. (Doc. 1, p. 11; Doc. 49, p. 4; Doc. 53, p. 6). Without allegations of more egregious conduct at the traffic stop, the Court is not aware of caselaw that indicates that the alleged use of billy clubs at the traffic stop precludes a finding that the officers were acting in their discretionary authority. If jurors

avoid summary judgment, Mr. Jones must "'establish that a reasonable jury could find that [Sgt. Voss and Officer Page] violated [his] constitutional right' to be free from excessive force 'and that his right was clearly established when [the officers] violated it.'" *Jones*, 136 F.4th at 1061-62 (quoting *Nelson,* 89 F.4th at 1296).

As an initial matter, in evaluating the evidence of the force Sgt. Voss and Officer Page when they arrested Mr. Jennings, the Court declines to consider Mr. Jennings's allegation in his complaint and in his response to the officers' special report that he was tased him in the groin.  (Doc. 1, p. 11; Doc. 49, p. 2).  The Court disregards this alleged fact for two reasons.  First, as the magistrate judge observed, accepting Mr. Jennings's assertion that he was lying face down in the Burger King drive-thru with Sgt. Voss kneeling on his back—an assertion that Mr. Jennings makes consistently through his factual submissions, (Doc. 1, p. 11; Doc. 53, p. 6)— it would be difficult for an officer to reach Mr. Jennings's groin with a taser.  (Doc. 61, p. 10).  Second, when paramedics from Tarrant Fire and Rescue examined Mr. Jennings in the Burger King lot on May 3, 2020, (Doc. 40-2, p. 10), the paramedics found taser "barbs" in Mr. Jennings's "left flank," (Doc. 40-2, pp. 9, 14).  There was a puncture wound in the area left of Mr. Jennings's left thoracic spine.  (Doc. 40-2,

---

accept Mr. Jennings's version of events, in evaluating the totality of the circumstances, jurors may consider whether the use of billy clubs at a traffic stop is evidence of a proclivity toward excessive force.

p. 13). The paramedics did not find puncture wounds in Mr. Jennings's groin area. (Doc. 40-2, p. 27). Because this medical evidence contradicts Mr. Jennings's report that Officer Page tased him in the groin and because it would be difficult for Officer Page to deploy his taser in Mr. Jennings's groin if Mr. Jennings was lying face down on the ground, the Court will not credit Mr. Jennings's assertion that Officer Page tased him in the groin. *Whitehead*, 403 Fed. Appx. at 403.[20]

Turning to the *Graham* factors, "an officer on duty may use reasonable force to effectuate a lawful arrest," *Charles v. Johnson*, 18 F. 4th 686, 700 (11th Cir. 2021), and objective officers in the positions of Sgt. Voss and Officer Page reasonably could use force to take Mr. Jennings into custody. Mr. Jennings had fled from a traffic stop and had led the officers on a high-speed chase through commercial and residential areas of Tarrant. (Doc. 64). Photographic evidence shows that the

---

[20] The Court is cautious in applying the medical evidence rule under the totality of the circumstances of this case. Because the Tarrant police and paramedics occupy the same building and often work side-by-side, the medical evidence in this case potentially lacks the objectivity of medical evidence in other contexts. The Court has followed the rule here because there are sufficient indicia of reliability of the barb locations in the paramedics' reports. Mr. Jennings has challenged the accuracy of the paramedic reports only to the extent that the reports indicate that he refused medical attention, and paramedics face exposure if they misreport patient information. (*See generally* Doc. 40-2, p. 27). On balance, the Court applies the medical evidence rule and credits the paramedics' report that Mr. Jennings was tased on his lower left back and left flank.

With respect to Mr. Jennings's arguments concerning refusal of medical attention, the paramedic reports support his argument that he did not refuse attention. Sgt. Voss signed the refusal of treatment form rather than Mr. Jennings. Sgt. Voss would not permit the paramedics to remove the taser barbs from Mr. Jennings's body; the paramedics only obtained Mr. Jennings's vital signs and ran an ECG. (Doc. 40-2, pp. 9-15).

vehicle chase ended when Mr. Jennings crashed his truck into a fence at a speed high enough to leave tire tracks, dent the grill of the truck, and snap a guy wire. (Doc. 40-1, pp. 45, 53, 59, 60, 63, 66, 67). In fleeing from police, first in his truck and then on foot, Mr. Jennings committed the crime of attempting to elude.[21] As the magistrate judge found, given Mr. Jennings's flight and the high-speed chase that ensued, it was objectively reasonable for Sgt. Voss and Officer Page to believe that Mr. Jennings was "actively resisting arrest or attempting to evade arrest by flight" before he laid down in the Burger King parking lot. (Doc. 61, p. 21). *Cunningham* instructs that from the perspective of an objective officer, flight supports the use of force to subdue the individual who flees. *Cunningham*, 141 F.4th at 1211.[22]

Additionally, as in *Cunningham*, an objective officer would perceive Mr. Jennings's conduct as an immediate threat to the safety of the officers and others.

---

[21] Under Alabama law, simple attempt to elude is a violation of Ala. Code § 13A-10-52(c)(1), a Class A misdemeanor. If Mr. Jennings drove 20 miles per hour or more above the maximum speed limit, then eluding the police would be a Class B felony under Ala. Code § 13A-10-52(c)(3)(b). The summary judgment record does not contain evidence that indicates whether Mr. Jennings's conduct constituted a misdemeanor or a felony, but the Eleventh Circuit has held that police officers may use force to arrest an individual who has fled from them. *Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018) (holding that where plaintiff "eluded the police vehicle, with its emergency lights and sirens activated, for more than five miles driving at a speed of more than 80 miles per hour, more than 10 miles per hour over the posted speed limit" and engaged in "what appeared to be reckless, dangerous, and elusive driving," the defendant police officer "undeniably was justified in using force to make an arrest").

[22] The Eleventh Circuit has described the *Graham* factor concerning a suspect's flight or effort to resist arrest as the "most important factor in determining whether the force used was justified." *Glasscox*, 903 F.3d at 1214.

Mr. Jennings not only drove through neighborhoods at high speeds and ran stops signs and red traffic lights, (Doc. 40-1, pp. 18, 27, 35; Doc. 64);[23] he also laid face down in the Burger King parking lot with his hands beneath him, and he did not respond to commands to show his hands. Viewing the evidence in the light most favorable to Mr. Jennings, the Court accepts his assertion that he could not hear Officer Page telling him to show his hands.[24] *Cunningham* instructs that the point is insignificant in the use-of-force analysis because an objective officer at the scene would know only that Mr. Jennings had his hands beneath him, Mr. Jennings would

---

[23]  Officer Morris ticketed Mr. Jennings for failure to stop at a stop sign in violation of Ala. Code § 32-5A-112(B), for reckless driving in violation of § 32-5A-90, and for running a redlight in violation of § 32-5A-32.  (Doc. 40-2, pp. 45-51).

As noted, Mr. Jennings asserts that he fled police in fear for his safety, but an objective officer observing Mr. Jennings's conduct would not be privy to Mr. Jennings's subjective motivation for that conduct.  Mr. Jennings suggests that the officers had it out for him because he was a sex offender.  Under the objective reasonable officer standard, the Court may not consider the officers' "underlying intent and motivation."  *Mobley v. Palm Beach Co. Sheriff Dept.*, 783 F.3d 1347, 1354 (11th Cir. 2015).

[24] Mr. Jennings's assertion that he could not hear Officer Page's commands to show his hands because Sgt. Voss was beating him (Mr. Jennings) in the head is difficult to reconcile with Mr. Jennings's contention that he heard Sgt. Voss yelling "sex offender" while Sgt. Voss beat him. (Doc. 49, p. 4; Doc. 1, p. 11).  Viewed in the light most favorable to Mr. Jennings, the Court infers that Sgt. Voss was yelling louder than Officer Page, that Officer Page commanded Mr. Jennings to show his hands after Sgt. Voss began beating Mr. Jennings in the head, and that Officer Page was further from Mr. Jennings's head than Sgt. Voss when he and Sgt. Voss were yelling at Mr. Jennings.

Though Sgt. Voss's reference to Mr. Jennings's criminal record during the yelling may provide some evidence of the totality of the circumstances surrounding the officers' use of force, "words alone [cannot] make ... an otherwise proper[ ] use of force unconstitutional under the Fourth Amendment" because "an officer's intentions do not affect the objective reasonableness of force." *Jones*, 136 F.4th at 1063 (internal marks and citations omitted).

not show his hands for cuffing, and Mr. Jennings could be holding a weapon in his hands. *Cunningham*, 141 F.4th at 1211 ("So even if Cunningham failed to comply because his arm was trapped, a reasonable officer in this situation could conclude that (1) Cunningham had a weapon on him and (2) his failure to surrender was an effort to conceal or gain control of that weapon."). As in *Cunningham*, the officer safety factor weighs against Mr. Jennings.

Under these circumstances, as the Eleventh Circuit stated in *Glasscox v. City of Argo*, Sgt. Voss and Officer Page "undeniably [were] justified in using force to make an arrest." *Glasscox*, 903 F.3d at 1215. Despite Mr. Jennings's assertion that he "was legitimately attempting to surrender" when the officers approached him in the Burger King parking lot, "it was objectively reasonable for [the officers] to question the sincerity" of the attempted surrender. *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009). As the Eleventh Circuit stated in *Mobley*, "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive." 783 F.3d at 1354. Thus, a reasonable officer could use the degree of physical force necessary to effectuate Mr. Jennings's arrest and maintain officer safety.

The *Graham* factor regarding the relationship between the justification for the use of force and the amount of force used favors Mr. Jennings. Per *Jones,*

34

officers may use force until a suspect thought to be armed is fully subdued. *Jones*, 136 F.4th at 1065 (reversing summary judgment in favor of officer on Mr. Jones's excessive force claim because "[t]aking Jones's version of events as true, he was subdued and in [the officer's] control after the wrist grab, twist, and push" such that "the additional chokehold and punch were gratuitous and excessive uses of force"). Per *Jones*, neither Sgt. Voss nor Officer Page could use force after Mr. Jennings was immobilized and no longer posed a threat to the officers. *Jones*, 136 F.4th at 1065 (stating that even a single punch might be excessive if the punch were delivered to an individual "who no longer pose[d] a danger to anyone") (internal marks omitted).

As Mr. Jennings pointed out in his rebuttal to Officer Page's declaration, (Doc. 51, pp. 3-5), in his use of force report, Sgt. Voss stated that the O.C. chemical he sprayed in Mr. Jennings's face immobilized him, (Doc. 40-1, p. 86), and in his use of force report, Officer Page stated that Mr. Jennings was immobilized after he tased him once, (Doc. 40-2, p. 5). Viewed in the light most favorable to Mr. Jennings, after either being maced or being tased once, he was in the lit Burger King drive-thru "on the ground face down (immobilized)." (Doc. 51, p. 4). If Sgt. Voss maced Mr. Jennings and the macing immobilized Mr. Jennings, then Officer Page could not deploy his taser. If Officer Page tased Mr. Jennings and the tasing immobilized Mr. Jennings (or, in Mr. Strickland's words, incapacitated him), then

Sgt. Voss could not mace Mr. Jennings.[25]  To paraphrase *Jones*, "[t]aking [Mr. Jennings's] version of events as true," once he was subdued with the initial use of force, "the additional [force used was] gratuitous and excessive."  *Jones,* 136 F.4th at 1065; *see also Robinson v. Sauls*, 46 F.4th 1332, 1342-45 (11th Cir. 2022) (finding that use of deadly force was constitutional as long as suspect posed a threat to police

---

[25] Mr. Jennings, Sgt. Voss, and Officer Page seem to agree that the force used was sequential rather than simultaneous.  If the record had indicated that Sgt. Voss and Officer Page arrived and, in the heat of trying to secure a suspect who had fled from them in a high-speed chase, simultaneously used mace and a taser to try to subdue a suspect who was laying on the ground with his hands beneath him and refusing commands to show his hands, the Court might conclude that the officers' concurrent use of force was objectively reasonable under the totality of the circumstances.  Here, Mr. Jennings and the officers report that the officers used force sequentially.  Given the time data from Officer Page's taser, the time information in the paramedic reports, and Sgt. Voss's declaration, jurors could conclude that many minutes elapsed between Officer Page's use of his taser and Sgt. Voss's use of his O-C spray.

As noted, in contrast to his complaint and his response to the officers' special report in which he maintained that Sgt. Voss maced him before Officer Page tased him more than once, in his declaration, Mr. Jennings suggests that Officer Page tased him at least once before Sgt. Voss arrived.  In his declaration, Mr. Jennings states that Officer Page arrived first and that in the light of the drive-thru lane, when Sgt. Voss arrived, Sgt. Voss saw taser barbs in Mr. Jennings's back and crashed down on Mr. Jennings's back, causing one of the barbs to roll and to enter Mr. Jennings's back backwards.  Mr. Jennings asserts that Officer Page then tased him again, for a total of three tases.  (Doc. 53, pp. 6-7, 8).

The different accounts of events in Mr. Jennings's submissions seem to stem from his efforts to poke holes in the officers' version of events.  Mr. Jennings's submissions in response to the officers' submissions contain several hypotheticals and rhetorical questions.  It is challenging to sift from Mr. Jennings's declaration, (Doc. 53), and his sworn response to the defendants' summary judgment motion, (Doc. 49), the facts concerning the use of force that Mr. Jennings recalls and the assertions by the officers that Mr. Jennings attempts to refute with possible scenarios.  On balance, Mr. Jennings seems to recall that Sgt. Voss maced him before Officer Page tased him.  To refute the officers' order of events, Mr. Jennings seems to accept Officer Page's assertion that he tased Mr. Jennings before Sgt. Voss used O.C. spray, but Mr. Jennings asserts that Officer Page tased him once before Sgt. Voss used O.C. spray and that Officer Page tased him again after Sgt. Voss maced him.  Thus, in every scenario that Mr. Jennings presents, including the one that appears to be an effort to discredit the officers' version of events, Mr. Jennings asserts that Officer Page tased him after Sgt. Voss drowned him with mace.

officers, but finding that there was "a genuine dispute of material fact as to whether [the two officers] used excessive force by shooting Mr. Robinson after he became unresponsive" where evidence showed that shots were fired 20 seconds after officers determined that the suspect no longer was a threat to them); *Glasscox*, 903 F.3d at 1214 (where video evidence showed that Mr. Glasscox "offered no resistance after the second use of the taser," subsequent use of a taser was excessive force); *compare Franklin v. Popovich,* 111 F.4th 1188, 1196 (11th Cir. 2022) (holding that officers could continue to use force against resisting arrestee where "at the key moment, [the arrestee] could at least appear to a reasonable officer as resisting arrest by pulling his arms (voluntarily or involuntarily, and for whatever reason) away from the officers standing on them. Thus, the operative facts are that [the arrestee] made a sudden move after having engaged in a shootout and fled from police, at a time and place that [the police officer] could reasonably have believed [the arrestee] was still armed"); *Hall v. McGhee*, 762 Fed. Appx. 837, 843 (11th Cir. 2019) (finding that where a reasonable officer could perceive the suspect's actions as "an attempt to flee or to retrieve a weapon," body-slamming, hitting, kicking, and putting a knee into a "potentially non-compliant" suspect's back to effectuate control over the suspect was not excessive and unlawful).

Applying this authority here and taking Mr. Jennings's version of events as true, if Sgt. Voss "drown[ed]" Mr. Jennings's face with mace after Mr. Jennings was

face down on the ground and immobilized because of Officer Page's tase, or if Officer Page tased Mr. Jennings after he was face down on the ground and immobilized because Sgt. Voss drowned him with mace, then one of the officers used force after Mr. Jennings no longer was a threat to the officers. In his declaration, Mr. Jennings states that he was "made unconscious and shocked deeply." (Doc. 53, p. 7). Mr. Strickland opines that Officer Page's use of his taser "immediate[ly] incapacitat[ed]" Mr. Jennings, and Sgt. Voss asserts that he sprayed Mr. Jennings with mace after Officer Page tased Mr. Jennings. As in *Jones* and *Robinson*, Sgt. Voss and Officer Page could use force, even serious force, while Mr. Jennings posed a threat to them, but once he was immobilized and no longer was a threat, any force used was excessive.

Mr. Jennings's injuries are consistent with the force he claims Sgt. Voss and Officer Page used. Mr. Jennings's booking photos show bruises and cuts to his face and head. (Doc. 40-2, p. 24).[26] Mr. Jennings had puncture marks from taser barbs in his left flank. (Doc. 40-2, pp. 5, 9, 13, 14, 15). Mr. Jennings complained to paramedics of lower back and abdominal pain. (Doc. 40-2, pp. 12, 15).[27] Though Mr. Jennings's injuries were not severe, he "'does not lose his ability to pursue an

---

[26] The paramedic report indicates that Mr. Jennings had "scratches on [his] head from bushes." (Doc. 40-2, p. 15). Mr. Jennings asserts that the scratches were "not bush scratches." (Doc. 49, pp. 24-25).

[27] Mr. Jennings states that after his arrest, he had difficulty urinating, problems with his bowels, and issues with his ears. (Doc. 1, p. 5; Doc. 49, p. 4).

excessive force claim merely because he has the good fortune to escape [an officer's use of gratuitous force] without serious injury.'" *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38-39 (2010)) (brackets added).   "A plaintiff who suffers only *de minimis* injury does not necessarily lack a claim for excessive force under § 1983." *Charles*, 18 F.4th at 700. The "core judicial inquiry" in an excessive force claim is the amount of force used, not the extent of the injury caused by the force. *Wilkins*, 559 U.S. at 38-39.

It is clearly established law in the Eleventh Circuit "that an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to [officer] safety." *Acosta v. Miami-Dade Co.*, 97 F.4th 1233, 1242 (11th Cir. 2024).  The Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."   *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014).   The Eleventh Circuit has "held that it was obviously clear to any reasonable officer— and therefore clearly established—that a police officer's use of force on a 'previously threatening' arrestee after the arrestee ceased any resistance was excessive." *Glasscox*, 903 F.3d at 1219 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419-1420 (1997), and finding that *Smith* "clearly established . . . that an officer's use of substantial force in subduing an arrestee once the arrestee has submitted to

the officer and ceased any resistance or threatening behavior is excessive"). Given this clearly established law and given that the summary judgment evidence viewed in Mr. Jennings's favor indicates that he was immobilized either after Sgt. Voss maced him in the face or after Officer Page tased him, clearly established law dictates that a subsequent use of force by either officer was excessive and unconstitutional. *See Glasscox*, 903 F.3d at 1219 (finding that in light of clearly established law, "no objectively reasonable officer . . . could have thought it was lawful to use a taser repeatedly on an arrestee who was not resisting, even if that arrestee had previously offered resistance and was not yet restrained").[28]

---

[28] The magistrate judge's careful analysis rests on several Eleventh Circuit cases. (Doc. 61, pp. 19-20). In those cases, evidence clearly indicated that the plaintiff was resisting arrest in some way when an officer used force. *See Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1279 (11th Cir. 2023) (body cam footage showed the plaintiff did not follow commands and broke free from an officer's grip); *Charles*, 18 F. 4th at 699-700 (video evidence showed the plaintiff resisting arrest and refusing to place his hands behind his back); *Mobley*, 783 F.3d at 1355 (plaintiff admitted that he refused to surrender his hands to be cuffed "despite the application of escalating force and repeated use of a taser"); *Crosby v. Monroe Co.*, 394 F.3d 1328, 1334-35 (11th Cir. 2004) (although plaintiff was lying face down, he "was able to wrestle his hand loose and push [the officer's] foot away," indicating that "he had not been subdued"). The disputed evidence in this case differentiates this case from *Baker*, *Charles*, *Mobley*, and *Crosby* and aligns it more with *Jones*.

Like *Charles*, *Mobley*, and *Crosby*, the Eleventh Circuit's recent decision in *Cunningham* is distinguishable. As in *Charles*, *Mobley*, and *Crosby*, the undisputed video evidence in *Cunningham* showed that Mr. Cunningham was resisting arrest when officers used force to subdue him. There is no such video evidence here. The disputed facts in Mr. Jennings's case regarding the officers' use of force after Mr. Jennings was subdued distinguish the facts in Mr. Jenning's case from the video evidence in *Cunningham*.

***

Accordingly, the Court overrules Mr. Jennings's objections regarding Officer Morris and grants Officer Morris's motion for summary judgment on Mr. Jennings's Fourth Amendment excessive force claim. With respect to Sgt. Voss and Officer Page, the Court sustains Mr. Jennings's objections and finds that, crediting his version of events, under *Jones*, a jury must decide whether Sgt. Voss or Officer Page used excessive force after Mr. Jennings was immobilized. Therefore, the Court denies the motion for summary judgment on Mr. Jennings's excessive force claim as to Sgt. Voss and Officer Page.

Mr. Jennings previously asked the Court to appoint an attorney to represent him. (Doc. 9). Mr. Jennings will need the assistance of an attorney for trial. The Court refers this case to the magistrate judge for appointment of an attorney and other preliminary matters for trial. When this case is ready for trial, the Court will issue a pretrial order.

The Clerk of Court shall please TERM the gavels on the April 8, 2024 summary judgment entry and on Doc. 61 and shall please TERM Officer Morris as a party to this action.

**DONE** and **ORDERED** this August 25, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

41